**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **BANQU, INC.,** | Case No: |
| *Plaintiff,* | **COMPLAINT FOR:** |
| v. | **1. BREACH OF CONTRACT** |
| **KEURIG TRADING SÀRL,** | **2. UNJUST ENRICHMENT** |
| *Defendant.* | **3. QUANTUM MERUIT** |
| | **4. PROMISSORY ESTOPPEL** |
| | **5. ACCOUNT STATED** |

**ANDERSON KILL P.C.**
1251 Avenue of the Americas
New York, NY 10020

*Counsel for Plaintiff BanQu, Inc.*

Plaintiff BanQu, Inc. ("BanQu") brings this action for breach of contract, unjust enrichment, quantum meruit, promissory estoppel, and account stated against Defendant Keurig Trading Sárl ("Keurig"), and alleges as follows:

## INTRODUCTION

1.     Plaintiff BanQu is a groundbreaking technology company that develops supply-chain software for large corporations around the world, including Coca-Cola, Dow, ECOM Trading, and AB InBev among others.  BanQu's blockchain-based software allows its customers to keep track of the sourcing and origin of each raw component that goes into the manufacture of those customers' own products.  In doing so, BanQu's platform enhances its customers' supply-chain traceability and transparency, which is critical to achieving both compliance and ethical-sourcing goals.

2.     As BanQu's customers, their investors, and end users have grown increasingly attuned to the origin of supply-chain materials, BanQu's software has become an integral part of corporations' efforts to practice good corporate citizenship.  BanQu's platform captures basic supply-chain data needed for its customers to make strategic business decisions while also collecting and providing data relating to environmental, social, human-rights, child-labor-monitoring, and governance considerations necessary to ensure sustainable and compliant sourcing.

3.     In advancing supply-chain transparency, BanQu's software also provides a humanitarian and fairness function by opening access to banking and other financial services for rural farmers in economically disadvantaged regions.  By providing tracing and sourcing information, BanQu helps those farmers establish their own economic identities and provide proof

1

of their transactions, thereby allowing them to borrow money and grow their businesses in a way that historically has been nearly impossible.



*BanQu CEO Ashish Gadnis meeting with farmers in Africa.*

4.     In 2022, BanQu entered into a multiyear agreement with Defendant Keurig Trading Sàrl ("Keurig"), which is an affiliate of the international beverage company Keurig Dr Pepper Inc. Under that agreement, Keurig agreed to purchase access to BanQu's platform, which BanQu agreed to provide under a three-year software-as-a-service ("SaaS") license model.  Keurig agreed to pay a total of $2,976,396 for the software license, in addition to further amounts for implementation services.

5.     BanQu built out customized functionality for Keurig, and Keurig's employees used BanQu's platform extensively throughout 2022 and 2023.  The supply-chain traceability functionality of BanQu's platform substantially advanced Keurig's stated goal to "responsibly source" its coffee.  Keurig features that objective prominently in its marketing materials and on its website as part of its campaign that it is "Committed to 100% Responsibly Sourced Coffee."[1]

---

[1] https://www.keurig.com/responsible-coffee



6.      As part of its fair-trade "commit[ment]," Keurig explains that "Responsibly sourced means the coffee we purchase is grown and sold in adherence to a credible sourcing program that aligns with our company Supplier Code of Conduct."  BanQu provided the data that permits Keurig to trace the origin of its coffee beans and other materials on a farm-by-farm basis.

7.      Indeed, Keurig entered a contract with BanQu in part because BanQu's platform provided significantly more precise data and information regarding the origin of Keurig's coffee than the services Keurig used at the time.  BanQu's technology tracks data on an individual-farm level, such that Keurig and its customers can verify the source of its products with certainty.  This level of traceability far exceeds the "credible sourcing programs"—like the well-known Fair Trade Certified organization—that Keurig had been using prior to engaging BanQu.  Those other services

3

offer audits, certifications, and codes of conduct, but they have no mechanism to provide the farm-level verification that BanQu's software does.

8.  But despite centrally featuring fair trade and supply-chain transparency in its marketing and business strategy—and benefitting substantially economically from doing so—Keurig has refused to pay BanQu as agreed.  Keurig instead takes the position that the only amount it owed to BanQu was the $90,000 it initially paid for basic access to BanQu's platform under an introductory and now-superseded agreement that did not call for any customization or specialization.

9.  That initial agreement indisputably did not contemplate any unique features or modifications tailored to Keurig's business, all of which BanQu provided to Keurig as it requested. And Keurig has taken the position that the initial agreement expired at the end of 2022, even though Keurig continued using the platform well into 2023, before BanQu suspended its access for lack of payment.

10.  The parties negotiated, agreed to, and finalized a three-year agreement, and both parties performed under that agreement.  BanQu built out the bespoke features that Keurig requested, and Keurig used the software as intended.  Keurig sold $4.3 billion of coffee in 2022 and $4.1 billion in 2023 in the U.S. alone, in large part because of its well-known commitment to fair trade and ethical business practices—which is exactly the functionality that the BanQu platform expanded and enhanced for Keurig's benefit.

11.  Keurig's contention that it is entitled to enjoy the substantial benefits that BanQu provided without paying for them is contrary to the parties' agreement and New York law, which governs the contract.

12.  BanQu therefore seeks to recover payment for the amounts due under the contract, in addition to costs and attorneys' fees as provided in their contract, and prejudgment and post-

judgment interest at the New York statutory rate.  In the alternative, BanQu seeks to recover under the equitable principles of unjust enrichment, quantum meruit, and promissory estoppel, and to disgorge Keurig's wrongful gains.

## THE PARTIES

13.     Plaintiff BanQu, Inc. is a Delaware corporation with its headquarters and principal place of business in Minnetonka, Minnesota.

14.      Keurig Trading Sàrl is a limited liability company (*société à responsabilité limitée*) organized under the laws of Switzerland, with its principal place of business in Lausanne, Switzerland.

## JURISDICTION, VENUE, & APPLICABLE LAW

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between the parties and the amount in controversy exceeds $75,000. BanQu is a Delaware corporation with its principal place of business in Minnesota. Keurig is a Swiss corporation with its principal place of business in Switzerland.

16.     Venue is proper in this District because, pursuant to § 13.2 of the Terms and Conditions of their contract, the parties have agreed that the federal and state courts of New York "have exclusive jurisdiction over any dispute between the parties . . . and the parties waive all objections based on inconvenient forum."

17.     New York substantive law governs the parties' rights and obligations under the contract pursuant to the choice-of-law clause in the Terms and Conditions. (*Id.*)

## FACTS

### A.    BanQu and Its Mission

18.     BanQu was founded in 2016 after one of its cofounders and CEO, Ashish Gadnis, finished his tenure as CEO of the U.S. Agency for International Development in the Democratic

Republic of Congo.  While in the DRC, Mr. Gadnis learned of a farmer who was unable to secure a loan to pay for her child's school tuition, as she could not verify the revenue generated by her farming operation.  Mr. Gadnis discovered that many farmers, despite providing produce and other products for some of the world's largest companies, often cannot access banking and other financial services because they are unable to verify their income with sufficient precision.

19.    After talking to many underserved farmers, Mr. Gadnis thought of a solution—creating digital records of rural farming operations using blockchain technology.  His idea was to use distributed-ledger functionality as the core of a software platform that verifies rural farmers' economic identities and professional profiles.  Farmers could then use that ledger to secure lending and banking services.

20.    Mr. Gadnis thereafter teamed up with cofounders Jeff Keiser and Hamse Warfa to launch BanQu.  Messrs. Gadnis, Keiser, and Warfa had the initial business objective of developing a software platform that would lift farmers out of poverty by helping them gain access to financial services.

21.    But BanQu also recognized that its product could provide massive benefits to corporations seeking transparency and traceability in their supply chains, for both corporate-citizenship and strategic business purposes.  Helping end-users better understand where the products they purchase originate and their natural-resource consumption has become increasingly important to companies around the world, as it drives both profit and ethical business practices.

22.    For example, after a farmer makes a sale to a down-chain entity, the sale is logged on the BanQu platform, recorded on the blockchain-based ledger, and the BanQu platform texts the farmer a receipt for their records. This receipt tangibly digitizes the sale for the benefit of the farmer and aids them in securing banking services.  That same information, permanently recorded on the blockchain, also allows companies and end users to identify who grew the coffee, cacao, or

rye that were used to make the product—and to verify that the products they buy did not involve unethical practices or coercive labor.

   

*BanQu text confirmation sent to a mobile phone.*     *Use of the BanQu platform on a smartphone.*

23.     BanQu software also facilitates corporations' compliance with regulatory supply-chain traceability requirements enacted by governmental bodies around the world.  Principal among those are the United States' and European Union's regulations requiring businesses to ensure they are not sourcing materials and ingredients from suppliers using forced labor, in addition to import bans on certain products from certain countries, and the tracking of so-called "critical raw materials" used across industries.  BanQu's platform also allows companies to meet sustainability goals, such as reducing the global impact of production by complying with regulations regarding deforestation and plastic packaging.

24.     BanQu has grown quickly since its founding in 2016, and today has a global reach. It operates in nearly 60 countries, provides support for 15 languages, and connects 2.5 million beneficiaries.  While it has partnerships with world-leading brands such as IKEA, Shell, Ardagh Glass, DOW, AB InBev, ECOM Trading, and Coca-Cola, BanQu's stated mission remains consistent with its humanitarian roots: to lift 100 million people out of extreme poverty by 2028.



*BanQu's worldwide reach today.*

**B.    Keurig and Its Claims to Value "Sustainability" and "Responsible Sourcing"**

25.    On information and belief, Keurig is a wholly owned affiliate of Keurig Dr Pepper. According to Keurig Dr Pepper, the company is a "leading beverage company in North America" with a "portfolio of more than 125 owned, licensed and partners brands" and an annual revenue of approximately $14 billion.[2]   The company's stated "Purpose" is "Drink Well. Do Good," explaining, "Drink Well to enhance the experience of every occasion from before dawn to after dusk.  Do Good to make a positive impact for our people, communities and planet."

26.    Like its parent company, the coffee company Keurig emphasizes sustainability and "doing good."  Among other things, it proclaims, "We love coffee.  It's what we do.  That's why we're always building on our sustainability efforts – from bean to cup.  In addition to our recycling initiatives, we're focused on areas like responsible sourcing, the use of recyclable materials, and

---

[2] https://keurigdrpepper.com/about-us

sustaining coffee growing communities."[3]  These claims are prominently featured on its website and in its marketing materials:



27.     Keurig also states that it is "working across [its] supply chain to identify areas that [it] can positively impact," and that it is seeking to "revitalize[e] coffee communities" in places like Sumatra, Honduras, Colombia, Uganda, and India.



28.     Through these and other corporate mission statements, Keurig seeks to convey that supply-chain transparency, traceability, and ethical business practices are at the core of its corporate mission.

---

[3] https://www.keurig.com/hub/sustainability

29.     This marketing strategy has worked for Keurig.  Keurig Dr Pepper's coffee division generated $4.3 billion in sales in 2022 and $4.1 billion in 2023 in the U.S. alone, in large part, on information and belief, because of Keurig's positioning as a good corporate citizen that is attuned to concerns like fair trade, sustainability, and supply-chain transparency.  Keurig contracted with BanQu to access its software platform to advance these same objectives.

30.     But, after contracting to purchase services from BanQu to further these purportedly central goals of supply-chain transparency and fair-trade sourcing, Keurig now takes the position that it does not have to pay for them.  Its position is in violation of the parties' contract and contrary to New York law.  It also harms BanQu by denying it remuneration for the platform and services it provided, which damages BanQu's ability to continue innovating in the space.  In doing so, Keurig undermines the objectives that it claims are central to its mission.

**C.      Keurig Purchases the "Starter Edition" Subscription Agreement in 2021**

31.     On December 31, 2021, BanQu and Keurig entered into an agreement for a subscription to BanQu's software platform and corresponding support services (the "2021 Basic Agreement").  That agreement, attached hereto as **Exhibit A**, consists of an "Order Form" and "Terms and Conditions."

32.     The Order Form provided the details of the services to which Keurig purchased access under the 2021 Basic Agreement.  Among other things, the Order Form identified the relevant project as two pilot efforts concerning coffee certifications in Honduras, the so-called Fair-Trade Organic pilot and the Responsibly Sourced pilot, both of which are part of Keurig's "independent and credible certification and verification programs."[4]

---

[4] https://www.keurig.com/responsible-coffee

33.     Under the 2021 Basic Agreement, BanQu agreed to provide, and Keurig agreed to purchase, a "starter edition" subscription to BanQu's platform, along with "basic" support services. The Order Form specified the features included and excluded from Keurig's subscription. Among other things, it included features such as access by 2 administrative users and up to 40 standard users, along with "basic support" (rather than "premium support"). Other features like "messaging" and the use of QR codes to track shipments were excluded. The agreement did not provide for any high-level customization or bespoke features. The Order Form also stated that any travel expenses that BanQu incurred would be billed separately.

34.     The 2021 Basic Agreement required Keurig to pay $90,000 upon execution. Under § 12.1 of the Terms and Conditions, the 2021 Basic Agreement would automatically renew each year, and the subscription fee would be billed on the anniversary date. Specifically, § 12.1 states that the 2021 Basic Agreement "automatically renew[s] for successive 12-month periods [] unless either party notifies the other party of its election not to renew upon at least 30 days' prior written notice."

35.     Basic access to BanQu's software under the "starter edition" plan is designed to acclimate the customer to the platform and to provide basic functionality. It does not include full access to all of BanQu's features, and it requires only minimal time and resources from BanQu's developers and software engineers.

36.     Each time BanQu signs a new customer to a "starter edition" subscription, its business objective is to provide high-level service and capabilities that grow and deepen its relationship and will ultimately lead to the customer upgrading its account to a more customized and fully built-out subscription tier. For that reason, the Order Form also sets forth the process by which the 2021 Basic Agreement can be easily amended and expanded.

37.    In particular, as the parties agree to add, remove, or modify products or services provided under the 2021 Basic Agreement, such "adjustments may be reflected in an invoice issued by BanQu that states the change in products or services provided along with revised amounts due." The modified invoice stating the new agreed terms would then be the basis of a binding amendment to the underlying 2021 Basic Agreement, and it would continue to be governed by the same Terms and Conditions. Keurig and BanQu agreed to this simple amendment process, as both parties anticipated deepening their business relationship.

38.    Section 12.3 of the Terms and Conditions set forth the requirements to terminate the agreement. In relevant part, either party can terminate prior to the expiration of the subscription for cause. That section states that the agreement can be terminated by the non-breaching party "in the event of the other party's Material Breach, if not cured within 30 days of the other party's receipt of written notice from the terminating party."

39.    Section 12.4 of the Terms and Conditions states that if the 2021 Basic Agreement expired or was terminated, Keurig's rights to use the platform would immediately cease and all fees owed by Keurig to BanQu would become immediately due upon receipt of the final invoice.

40.    Section 13.3 of the Terms and Conditions states that the prevailing party to any suit or action brought by one party against the other party to enforce the terms of the 2021 Basic Agreement or any rights or obligations thereunder would be entitled to receive its reasonable costs, expenses, and attorney's fees of bringing such suit or action from the other party.

**D.    Keurig Extends and Enhances Its Subscription Agreement in 2022**

41.    A few months after executing the 2021 Basic Agreement, Keurig requested and BanQu agreed to extend and enhance the terms of the 2021 Basic Agreement, as the parties anticipated they would (the "2022 Enhanced Agreement").

42.    The parties extensively discussed the functionality that Keurig sought to add to its subscription, and they came to agreement on the terms of the 2022 Enhanced Agreement.  At the time, Keurig was also working closely with consultants and advisors from Accenture.  Personnel from BanQu, Keurig, and Accenture discussed at length and agreed to the functionality that BanQu would provide to Keurig.

43.    During these discussions, Keurig agreed to extend the parties' contract to a three-year period, and it wanted to broaden the scope of its subscription.  Among other things, Keurig planned to use BanQu's software to enhance its ability to trace the origin of its coffee beans and other raw materials to further its goals of ensuring 100% "responsibly sourced" products.

44.    The certification programs Keurig relied on at the time—principally the well-known Fair Trade Certified program—had no mechanism to provide the farm-level verification that BanQu's software does.  Those programs instead rely on codes of conduct and representations from suppliers about the origin of their materials; they cannot provide farm-by-farm origin data.



45.    Fair Trade Certified is a third-party certification organization that has developed a recognizable brand and logo.  Companies like Keurig emphasize their Fair Trade Certified credentials in their marketing materials to show the marketplace that they sell ethically sourced products and engage in sustainable business practices.  Fair Trade Certified also maintains a

"Partner Directory" on its website that lists companies it has certified, which provides additional indication to the market that those companies comply with its certification process.

46.     Obtaining and maintaining the Fair Trade Certified certification is a substantial business cost.  On information and belief, Keurig pays many millions of dollars per year to maintain its Fair Trade Certified certification—substantially more than the approximately $1 million annual subscription that Keurig purchased from BanQu.

47.     BanQu's platform provided two substantial benefits to Keurig, as compared to Keurig's existing sustainability platforms like Fair Trade Certified.  First, BanQu's software enhanced and deepened Keurig's supply-chain transparency in a way that those platforms could not match.  By using BanQu, Keurig could trace the precise farm that produced the coffee beans and other raw materials that went into its products.  That visibility would in turn enable Keurig to guarantee to its customers, investors, and business partners that its products were ethically and sustainably sourced—which Fair Trade Certified and others did not allow it to do.

48.     Second, BanQu's platform was many times less expensive than the amounts Keurig paid annually for certification by Fair Trade Certified.  As a result, Keurig would be able to build out its own supply-chain transparency capabilities that would surpass those otherwise available to it at a fraction of the cost.  Doing so would directly benefit Keurig's bottom line and would drive value to its shareholders.

49.     On information and belief, Keurig intended to use BanQu's less expensive and more capable platform to create its own traceability capabilities, which would both fill the gaps in the services offered by Fair Trade Certified and provide Keurig substantial negotiating power to reduce the millions of dollars it paid to Fair Trade Certified annually.  Eventually, the platform that BanQu would build for Keurig could even replace Keurig's use of Fair Trade Certified entirely.

50.    For these reasons, Keurig was motivated to expand its subscription with BanQu and for BanQu to build out additional functionality tailored to Keurig's business.  Keurig referred to its anticipated farm-by-farm in-house transparency platform as the "Connected Coffee Network," and the effort was principally led by Keurig's then Chief Supply Chain Officer, Tony Milikin.

51.    To build out the Connected Coffee Network functionality, Keurig's expanded subscription agreement with BanQu included access to many more advanced features and permitted access by many more users.  Among other things, the 2022 Enhanced Agreement provided to Keurig:

(a)    Access to the fully functional "Enterprise Application" (rather than the "Base Application" under the basic agreement)

(b)    Support for 255 active users (up from 40 under the basic agreement)

(c)    The ability to specify up to 25,000 farmer identities (up from 600 under the basic agreement)

(d)    Support for 11 real-time messaging users (up from 0 under the basic agreement)

(e)    Support for 11 "Track & Trace" QR code users (up from 0 under the basic agreement)

(f)    Support for 11 API/integration users (up from 0 under the basic agreement)

52.    Each of these features required substantial investment by BanQu, its product development team, and its software engineers, as BanQu agreed to build out sophisticated capabilities that were tailored to Keurig's users, objectives, and business strategy.

53.    The 2022 Enhanced Agreement also provided for substantially expanded technical support.  Under the "Premium" technical support plan, Keurig was entitled to receive much faster engineer response times and more customized technical solutions, at meaningfully increased cost to BanQu.

54.     None of these software features or related services was included in the "starter edition" 2021 Basic Agreement.

55.     On May 1, 2022, BanQu issued Invoice #KDRP1004 reflecting the agreed terms of the 2022 Enhanced Agreement, including the extended three-year term and the substantially expanded features (the "May 2022 Invoice").  That invoice, attached hereto as **Exhibit B**, required Keurig to pay the agreed total of $2,976,396 for access to the software platform, plus an additional amount for implementation services.  Payment was due upon receipt.

56.     That same day, BanQu provided Keurig—at Keurig's request—with access to the agreed enhanced software features, and Keurig employees and personnel began accessing and using those enhanced features.

57.     Keurig did not make immediate payment as required.  But, as the Terms and Conditions of the parties' underlying agreement provided, the parties had agreed that their contract could be readily amended by agreeing on revised terms and memorializing those terms in an updated invoice—which BanQu did.  As a result, even though Keurig did not pay the invoice on receipt as required, BanQu nevertheless honored its commitment to permit Keurig's enhanced access, and it began the process of building out Keurig's set of bespoke features.

**E.     The Parties Perform Under the 2022 Enhanced Agreement, Exactly as Intended**

58.     Throughout 2022 and into 2023, both parties performed under the contract, further reflecting their shared agreement that the terms of the 2022 Enhanced Agreement governed.

59.     For its part, BanQu continued working on Keurig's projects in Honduras called for by the initial agreement, while it also began enhancing the platform as Keurig directed for the planned implementations in a variety of projects in Brazil, Colombia, Indonesia, East Asia, and the U.S. pursuant to the 2022 Enhanced Agreement.

60.     The implementation of Keurig's new projects—each utilizing BanQu's enhanced platform capabilities and involving numerous farmers and users—required substantial resources from BanQu's team, including software development, onboarding, and interaction with Keurig's employees and suppliers.  CEO Mr. Gadnis himself oversaw a number of the Keurig projects in detail, and he personally traveled to the Honduras project location to ensure the BanQu platform was being implemented efficiently and properly.

61.     BanQu's technical staff and software engineers worked at length to build out the capabilities required for each of Keurig's project sites, including the customized features and interconnectivity that Keurig required for its business.  Each of these additional projects was outside the scope of the 2021 Basic Agreement, and BanQu would not have undertaken the substantial efforts each required had Keurig not agreed to the 2022 Enhanced Agreement.

62.     BanQu provided all agreed access and functionality called for the by 2022 Enhanced Agreement, as memorialized in the May 2022 Invoice.

63.     Meanwhile, Keurig took full advantage of the BanQu software.  From the time the 2022 Enhanced Agreement went into effect in May 2022 until September 2023, Keurig users logged into the BanQu platform several hundred times, and the BanQu software recorded nearly 500 transactions for Keurig in Honduras alone.

64.     While Keurig-affiliated users were actively using the platform, Keurig corporate employees also onboarded and integrated BanQu's team into the broader Keurig ecosystem. Among other things, Keurig, through its Director of Commodity Sourcing, had BanQu meet with its coffee suppliers in Honduras and Colombia in order to implement the BanQu platform.

65.     Keurig also directed BanQu to meet with Keurig's third-party risk management team for a routine assessment performed on Keurig's new vendors.  The assessment centered on Keurig's confidential information that BanQu may have access to while providing the agreed

services.  Keurig stated that the assessment was necessary because, by providing the enhanced platform services, "BanQu will have access to KDP data."

66.    Keurig further directed BanQu to attend a two-day workshop with Keurig and its advisory team at Accenture pertaining to the Connected Coffee Network, which involved projects that likewise exceeded the scope of the 2021 Basic Agreement.  Keurig tasked BanQu with specific action items in connection with that workshop, including assembling materials regarding the rollout of Keurig's various new international projects and the use of personally identifying information pertaining to Keurig's contracted coffee farmers that BanQu would have access to as one of Keurig's supply-chain software vendors.

67.    Throughout this period, both BanQu and Keurig performed under the 2022 contract, including by launching and implementing projects around the world in countries that were not within the scope of the 2021 Basic Agreement.  Keurig received the benefits of its bargain, as agreed, and it never contended otherwise.  But Keurig still failed to pay BanQu the agreed upon fee for its enhanced access to the BanQu platform.

**F.    Keurig Begins Backtracking and Seeks to Retrade on the 2022 Enhanced Agreement**

68.    In the months after the 2022 Enhanced Agreement was agreed and memorialized by the May 2022 Invoice—and while the parties were performing under the terms of that agreement—Keurig began to try to backtrack from its prior agreement to expand the scope of the parties' contractual relationship.

69.    After weeks of failing to pay the agreed invoice, Mr. Milikin, Keurig's Chief Supply Chain Officer, wrote to Mr. Gadnis in June 2022 in an effort to retrade on the terms of the deal.  Mr. Milikin referred to the May 2022 Invoice as a the "BanQu proposal"—as if it had not already been agreed—and he demanded a 50% percent reduction in the already-discounted

subscription price that BanQu had agreed to. He tried to justify the request by asking BanQu to "invest in the future," and saying that he "truly believe[d]" that Accenture, which was providing consulting services to Keurig, would "use this solution[] to open numerous engagements."

70.     In other words, Keurig wanted a discount, even though it had already agreed to terms, its employees and affiliates had already begun using the platform, BanQu had already begun its rollout of the expanded platform at Keurig's new project sites, and both parties had otherwise broadly started performing under the 2022 Enhanced Agreement.

71.     Mr. Milikin did not offer any rationale for his attempted retrade other than to say that Accenture had "reduced their proposal and fees by 50%" and that he had "requested the same with Leo @ SourceMap," another Keurig vendor.

72.     This attempt to rewrite the parties' agreement continued for the following months, with Keurig continually withholding payment in an effort to force BanQu into modifying the agreement and accepting substantially worse terms.

73.     BanQu had still not been paid by October 2022, after months of providing services and bringing new capacity online for Keurig's projects. Around that time, Keurig told BanQu that it wanted to amend the 2022 Enhanced Agreement so that its duration was only 18 months rather than 3 years. Mr. Gadnis wrote to Keurig on October 23, 2022 stating that BanQu could agree to amend the agreement as requested, but only if Keurig agreed to pay a higher annual subscription price than had previously been agreed. Mr. Gadnis wrote:

> The software license = ~ $3MM unpaid which we gave a massive discount on 3 years which your contract guys are making issues with payment terms. As I told your guys we can change the term to 18 months and payment terms but then we can't give the discount.

74.     Mr. Gadnis thereby offered to amend the duration of the agreement in exchange for a higher annual rate in order to take account of Keurig's changing business approach. But when

Keurig did not accept that proposal, the original terms of the 2022 Enhanced Agreement continued unchanged.

75.     Increasingly frustrated with Keurig's failure to pay while still benefitting from BanQu's platform and services, Mr. Gadnis continued in his email, "I've not see[n] a single dollar for all our work since May 2022. . . .  We REALLY need to get paid."

**G.     Keurig Terminates the Employee Responsible for Its Relationship with BanQu, Then Claims It Never Entered the 2022 Enhanced Agreement**

76.     Around this same time in October 2022, Keurig terminated the employment of Mr. Milikin, who had been the Keurig employee primarily responsible for working with BanQu.  Mr. Milikin was centrally involved in negotiating and finalizing the 2022 Enhanced Agreement, and he had led the integration of BanQu's platform into Keurig's business.  On information and belief, Mr. Miliken was also the primary driver within Keurig for building out the Connected Coffee Network platform, through which Keurig intended to provide 100% supply-chain transparency.

77.     On information and belief, Keurig terminated Mr. Miliken at least in part because more senior executives at Keurig, for their own business-relationship reasons, did not want to disrupt Keurig's relationship with Fair Trade Certified.  On information and belief, Keurig executives had and have connections to those at Fair Trade Certified, and Keurig's payment of annual fees to Fair Trade Certified was important to maintaining those relationships.

78.     If Mr. Miliken and BanQu had been successful at building out the anticipated Connected Coffee Network capabilities, Keurig itself would be able to prove the origin of Keurig's coffee beans down to the exact farm on which they were grown.  That level of transparency, which BanQu had spearheaded and advanced, was beyond Fair Trade Certified's capabilities.

79.     On information and belief, Keurig's executives did not want to jeopardize the company's relationship with Fair Trade Certified by developing more capable transparency

practices using BanQu's platform—even though doing so would have provided benefits to Keurig's customers and would have been substantially less expensive to the company.

80.    On information and belief, concerned that Keurig's relationship with Fair Trade Certified may suffer if the Connected Coffee Network project was completed, Keurig instead terminated Mr. Miliken and tried to back out of the deal it had struck with BanQu by falsely claiming it had never been entered in the first place.

### H.    Keurig Tries to Manufacture Business Documents to Support Its False Claim that It Never Entered the 2022 Enhanced Agreement

81.    After BanQu refused to grant Keurig an after-the-fact 50% price discount and would not consent to reduce the agreed duration by 50%, Keurig changed its course.  With Mr. Miliken terminated, Keurig began claiming that it had never entered into the 2022 Enhanced Agreement at all.  Its new tactic was to try to buy its way out of the deal by forcing BanQu to accept less than 10% of what it was owed—and it did so by seeking to create a false documentary record of the parties' business dealings.

82.    In an October 23, 2022 email to Keurig, Mr. Gadnis sought the $2,976,396 that Keurig owed for the BanQu software, and he also referenced two other amounts that Keurig had failed to pay under the agreement: (i) out-of-pocket travel costs and (ii) $200,000 in accrued implementation fees associated with launching the various Keurig projects on the BanQu platform.

83.    Keurig targeted these ancillary travel and implementation fees in an attempt to avoid paying the full amount due.  Susan Lyons, a Keurig employee who, on information and belief, took over responsibility for communications with BanQu following Mr. Miliken's termination, wrote on December 12, 2022:

> Hi Ashish – I just wanted to clarify the consulting fees and travel so I have the correct request for funds.  As you know, we are not in a position to sign any software agreements yet, but we do want to align with you on outstanding consulting fees and travel. . . . Can you

please share an agreement for us to sign that is just consulting and travel – no software at this point so I can help to process those costs.

84.    With this email, Keurig attempted to manufacture a false record by purportedly "memorializing" that BanQu "know[s]" that Keurig is "not in a position to sign any software agreements yet." The statement is self-serving and plainly false, as it was sent *in response to* Mr. Gadnis's email insisting that Keurig pay BanQu the amounts it owed under an *already agreed* software contract.

85.    This statement was also notably disingenuous because, by the time this email was sent in December 2022, BanQu had continued work on the Connected Coffee Network rollout for Keurig across the globe, numerous farms and users had been onboarded, and Keurig's own employees had been using the expanded features on BanQu's platform for months. Keurig's insistence that it was for some reason entitled to these benefits free of charge and without having agreed to a contract in advance is not credible.

86.    Moreover, Keurig's request that BanQu create and send "an agreement for us to sign that is just consulting and travel" is a concession that no such "consulting and travel" agreement for $200,000 ever existed, as Keurig was then requesting it for the first time. Without any separate "consulting and travel" agreement, the only contract that could possibly govern these expenses—which had already been incurred—was the 2022 Enhanced Agreement.[5]

87.    Further, Mr. Gadnis did not refer to "consulting fees" in his prior email, as Ms. Lyons claimed. He instead referred to "implementation fees." The difference is notable—BanQu does not provide standalone "consulting" services to anyone, let alone to companies that are not

---

[5] This conclusion is confirmed by Keurig's later June 2023 letter, (*see infra* Part J & Ex. E), stating that the $200,000 payment that Keurig eventually made was "**not** governed by or paid pursuant to the" 2021 Basic Agreement. The only other contract that has ever existed between the parties is the 2022 Enhanced Agreement.

actively licensing BanQu's software. It does, however, provide "implementation" services to customers that have agreed to software-licensing agreements. Through its implementation efforts, BanQu onboards new users and new projects onto the BanQu platform—thereby facilitating the software licensing contract that has been agreed.

88.    Mr. Gadnis conveyed this point to Keurig, explaining that BanQu would not create an after-the-fact agreement that does not even align with its business practices. Mr. Gadnis wrote:

> Hi Susan, since we are SaaS company we don't have separate consulting agreements. We embed them in the licensing and we billed the first 3 (75, 75, 50 over the past 3 quarters). I had also explained this [to] your contracts folks.

89.    Seeing that BanQu would not grant Keurig's request to reverse-engineer a separate agreement, Keurig changed its tack again.

90.    Rather than asking to enter into a new *agreement* regarding those expenses, Ms. Lyons shifted her request to ask for separate *invoices* for just the implementation services and BanQu's accrued travel costs. BanQu ultimately agreed to that request, and it separated the implementation fees and travel costs from the software fees.

91.    But Keurig was still not satisfied because the now-separated invoices continued to refer to the 2022 Enhanced Agreement—which is the contractual basis for those amounts—and included date ranges reflecting the contract's agreed 36-month term. In rejecting the invoices, Ms. Lyons wrote, "We need all references to the subscription and dates for the subscription removed. Items should reference the consulting services delivered and travel."

92.     In other words, Keurig wanted BanQu to issue invoices—for work that BanQu actually performed pursuant to the 2022 Enhanced Agreement—that did not reference the underlying agreement pursuant to which that work was performed.[6]

93.     BanQu decided that it would reissue the invoices stripped of any reference to the underlying agreement so that it could—finally—receive at least a small portion of the compensation that Keurig owed to it.  BanQu thereafter reissued individualized invoices for (i) the software platform subscription fees, (ii) the implementation fees, and (iii) travel costs.

94.     Incredibly, Keurig was *still* not satisfied.  Ms. Lyons wrote to Mr. Gadnis again, stating that the Keurig "finance/accounting team . . . asked that you update the date on the invoice to reflect it as December" 2022 instead of May 2022, and that if BanQu did so, Ms. Lyons assured BanQu that Keurig would "get them processed."

95.     In making this request, Keurig again sought to create an inaccurate documentary record, as it is indisputable that no agreement was entered regarding implementation fees or travel costs in December 2022, none of those expenses was actually incurred in December 2022, the invoices were not issued in December 2022, and the obligation to pay them did not arise in December 2022.

96.     By substituting December 2022 for May 2022, Keurig evidently believed it could continue the fiction that BanQu was for some reason providing these services and incurring these travel costs for reasons that had nothing to do with Keurig's purchase of an expanded software license governed by the 2022 Enhanced Agreement.

---

[6] This manufactured record predicably teed up Keurig's contention in its June 2023 letter that the $200,000 payment had nothing to do with the parties' underlying agreement.  (*See infra* Part J & Ex. E.)

97.    Keurig is wrong.  Even setting aside the lengths to which Keurig went to massage this record, that Keurig paid the fees acknowledges the validity of the 2022 Enhanced Agreement. The fees incurred were for "implementation" relating to the BanQu software for several of Keurig's projects.  Keurig's payment concedes that Keurig agreed to purchase access to that software for those same projects—there would otherwise be nothing to "implement."

**I.    Keurig Finally Acknowledges It Owes BanQu the Licensing Fee Under the Enhanced Agreement, But Still Fails to Pay**

98.    In January 2023, Mr. Gadnis met with David Lainchbury, Keurig's Chief Procurement Officer & Senior Vice President of International Operations, regarding BanQu's and Keurig's ongoing business relationship.

99.    After their meeting, Mr. Gadnis sent Mr. Lainchbury a follow up email, summarizing BanQu's continuing work for Keurig and addressing the fact that Keurig still had not paid BanQu the nearly $3 million software-licensing fee it owed under the 2022 Enhanced Agreement.  Mr. Gadnis attached the reissued invoice reflecting only the unpaid licensing fee. (*See* **Exhibit C**.)  He also made clear that the additional rollout allotments provided by the 2022 Enhanced Agreement corresponded to the various projects that BanQu was already implementing for Keurig.  Mr. Gadnis wrote:

> **The enterprise license that was deeply discounted** (attached here and separate from consulting as Susan had asked us to do in December) **back in May 2022** includes the Honduran rollouts and you can allocate the remaining 8 to Brazil, Colombia, Indonesia for coffee and USA, East Asia etc. for recycling. **This outstanding is the one that I mentioned is the biggest concern for our legal / compliance and accounting folks as that's still open. If you can get that paid asap I would very much appreciate.**

100.    Mr. Lainchbury responded, finally acknowledging that Keurig owed BanQu the outstanding amounts and indicating that he would arrange for payment.  He stated that Keurig and BanQu were "fully aligned," that Keurig would need "about a month to get [its] ducks in a row"

and that a different Keurig employee will "alert [BanQu] when the transfer happens" of the outstanding amounts owed. Mr. Lainchbury wrote:

> **From:** "Lainchbury, David" <David.Lainchbury@kdrp.com>
> **Date:** January 11, 2023 at 6:16:37 AM EST
> **To:** Ashish Gadnis <ashish.gadnis@banquapp.com>
> **Cc:** "Jannet, Cyrille" <Cyrille.Jannet@kdrp.com>
> **Subject: RE: BanQu KDRP recap**
>
> Hi Ashish
>
> Great to see you earlier this week , fully aligned with your notes below .. I think we need about a month to get our ducks in a row ..but in the meantime lets nail the Honduras project !
>
> In terms of the payment , Cyrille is managing through the process and will alert you when the transfer happens
>
> Thanks and safe onward journey !
>
> Dave

101.    Notably, Mr. Lainchbury did not challenge any aspect of the invoice calling for payment of the outstanding $2,976,396 amount, which Mr. Gadnis had attached to his email, nor did he otherwise indicate that Keurig believed it owed something less than the full amount. To the contrary, he agreed that Keurig was "fully aligned" with Mr. Gadnis's request to "get it paid asap." Despite these assurances, Keurig did not make that payment.

102.    Further, neither Mr. Lainchbury nor anyone else at Keurig ever claimed that the 2021 Basic Agreement remained in effect rather than the Enhanced Agreement. In particular, Keurig did not take any action consistent with a position that the 2021 Basic Agreement automatically renewed by its terms on December 31, 2022, and again on December 31, 2023. Nor has it ever claimed that the initial agreement provided the software licensing rights that enabled Keurig to continue using the BanQu platform throughout 2021, 2022, and 2023.

103.    Most critically, Keurig did not ever make subsequent annual $90,000 payments to BanQu as it would be required to do if it really were the case that the Enhanced Agreement was not entered, and the 2021 Basic Agreement continued to apply.

104.    This separately is a concession by Keurig that the parties entered into the 2022 Enhanced Agreement, and that the new agreement's terms—including the time period and project scope—superseded the 2021 Basic Agreement, as intended.

105.    If Keurig truly believed that it did not enter into the Enhanced Agreement with BanQu, it would have made subsequent $90,000 annual payments under the 2021 Basic Agreement, and it would have restricted its scope of use to only that provided for by the 2021 Basic Agreement.  It did not do either.

**J.    BanQu is Forced to Take Action Against Keurig for Its Failure to Pay What It Owes**

106.    Having provided access to its software platform for nearly a year without any payment, BanQu was forced to exercise its right under the parties' agreement to withhold performance until Keurig cured its material breach.  On March 20, 2023, BanQu suspended Keurig's access to the platform.  Keurig still did not pay.

107.    On May 15, 2023, BanQu's counsel sent a letter to Keurig demanding payment of the outstanding balance of $2,976,396 due under the 2022 Agreement.  (*See* **Exhibit D**.)  Keurig responded on June 2, 2023, claiming, "Keurig never agreed . . . to extend the term of the Customer Agreement . . . or expand the scope of [the] software it received."  (*See* **Exhibit E** at 1.)  That statement is false, as it is directly contrary to a year's worth of performance by both parties, which readily reflected both an extended term and an extended scope.

108.    Keurig also noted in its letter that it had separately paid BanQu approximately $200,000 in "consulting fees," while also expressly acknowledging that the $200,000 payment was

"not governed by or paid pursuant to the" 2021 Basic Agreement.  (Ex. E at 1 n.1.)  Keurig did not explain, nor could it, why Keurig had paid $200,000 to BanQu if it was not made in accordance with either the 2021 Basic Agreement or the 2022 Enhanced Agreement.

109.    That is because the $200,000 was not for some undefined "consulting" services; it was to compensate the BanQu team for implementing the projects that the parties agreed to under the 2022 Enhanced Agreement.

110.    BanQu's efforts to resolve this dispute out of court have not been successful, and it now brings this action to recover the amounts it is owed under the contract, in addition to recovering its attorneys' fees and other damages.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Breach of Contract

111.    BanQu incorporates the foregoing paragraphs as if fully set forth herein.

112.    The 2021 Basic Agreement and its amendment, as memorialized in the 2022 Enhanced Agreement, constitute valid and enforceable contracts.

113.    BanQu has fully performed its obligations under the 2021 Basic Agreement and the 2022 Enhanced Agreement.  To the extent BanQu did not perform any obligation under those agreements, its performance was excused by Keurig's breach and/or failure to perform.

114.    Keurig breached the 2022 Enhanced Agreement by failing to pay Keurig the software-licensing fee it agreed to pay.  $2,976,396 remains outstanding in connection with that agreement.

115.    The 2021 Basic Agreement and the 2022 Enhanced Agreement also entitled BanQu to recover the attorneys' fees and costs it has incurred in pursuing this action.

116.    As a result of Keurig's breach, BanQu has suffered damages in an amount to be determined at trial, but in no event less than $2,976,396, plus New York statutory interest of 9% per year compounded.  *See* NY CPLR § 5004.

## SECOND CAUSE OF ACTION
### Unjust Enrichment

117.    BanQu incorporates the foregoing paragraphs as if fully set forth herein.

118.    BanQu provided benefits to Keurig in the form of software licenses, access to the BanQu platform, and professional support services, which were related to Keurig's business, including its compliance programs.

119.    Keurig has prominently featured its efforts to ensure that its products align with principles of fair trade, sustainability, and supply-chain transparency for its own commercial benefit.  Upon information and belief, consumers credit Keurig's efforts to advance these objectives, which provides Keurig with substantial economic benefits, including increased revenue and profits.

120.    Keurig's use of BanQu's software platform was instrumental in advancing these corporate objectives.  Keurig's use of BanQu's software was therefore directly responsible for a portion of Keurig's corporate revenues and profits.

121.    BanQu provided these software licenses and professional support services at its own expense and for Keurig's benefit.

122.    Keurig is a sophisticated party that knew the value of the benefits BanQu provided to Keurig.  But Keurig did not pay BanQu for the use of its software platform and its professional support services, even though that software and those services conferred a substantial economic benefit on Keurig.

123.    It would be against equity and good conscience to permit Keurig to retain those benefits for itself, since they were generated by using BanQu's software and professional support services that Keurig refuses to pay for.

124.    It would be against equity and good conscience to permit Keurig to retain any other benefits provided by BanQu that Keurig has not paid for.

125.    Keurig Dr Pepper's net sales attributable to coffee in the U.S. alone amounted to approximately $4.3 billion in 2022 and $4.1 billion in 2023, a meaningful portion of which is attributable to Keurig's claims to promote fair trade, sustainability, and supply-chain transparency—all of which were in turn supported in part by Keurig's use of BanQu's software platform and professional support services.

126.    As a result of Keurig's unjust enrichment to BanQu's detriment, BanQu seeks disgorgement and further damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### Quantum Meruit

127.    BanQu incorporates the foregoing paragraphs as if fully set forth herein.

128.    BanQu provided valuable services to Keurig, including software licenses, access to the BanQu platform, and professional support services.

129.    BanQu provided those services to Keurig in good faith.

130.    The parties' mutual understanding was that Keurig would pay BanQu the value of the software licenses, access to the BanQu platform, and professional support services, and BanQu expected such compensation.

131.    Keurig accepted these services from BanQu, including but not limited to software licenses, access to the BanQu platform, and professional support services with a total value of at

least $2,976,396, which does not reflect the promotional discount that BanQu offered to Keurig under the 2022 Enhanced Agreement.

132.    Keurig did not remit payment for a portion of the software licenses, access to the BanQu platform, and professional support services, with a total value of at least $2,976,396.

133.    As a result, BanQu has suffered damages, and will continue to suffer damages, in an amount to be proven at trial, but in no event less than $2,976,396, plus 9% annual interest New York statutory interest of 9% per year compounded.  *See* NY CPLR § 5004.

**FOURTH CAUSE OF ACTION**
**Promissory Estoppel**

134.    BanQu incorporates the foregoing paragraphs as if fully set forth herein.

135.    Keurig made a clear and unambiguous promise to BanQu to pay BanQu for software licenses, access to the BanQu platform, and professional support services that BanQu would provide.

136.    Keurig was in a position to fully perform, fulfill, and carry out the terms and conditions of the promise it made to BanQu, but Keurig did not do so.

137.    It was foreseeable that Keurig's promise would cause BanQu to act in reasonable reliance on Keurig's promise.  It was also foreseeable that BanQu would rely on Keurig's promise in undertaking the actions it took in response to Keurig's promise.

138.    BanQu acted in accordance with and complied with all directives, instructions, and requests made to BanQu by Keurig in connection with BanQu's provision of software licenses, access to the BanQu platform, and professional support services to Keurig.

139.    As a result of BanQu's reliance, BanQu suffered a substantial change in position as well as damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### Account Stated

140.    BanQu incorporates the foregoing paragraphs as if fully set forth herein.

141.    BanQu provided Keurig with an invoice under the 2022 Enhanced Agreement that set forth the total amount due for BanQu's provision of software licenses, access to the BanQu platform, and professional support services to Keurig.

142.    Keurig made a partial payment of the amounts set forth on the invoice.

143.    BanQu thereafter reissued the invoice to reflect the amount that was still outstanding. (*See* Ex. C.)  BanQu accepted that reissued invoice, acknowledged it was correct, and agreed to pay to BanQu the amount due, which totaled $2,976,396.

144.    Keurig promised to pay the invoiced amount to BanQu, but Keurig has failed to pay the balance due to BanQu.

145.    As a result of Keurig's failure to pay the balance due on the invoice, BanQu has suffered damages in an amount to be proven at trial, but in no event less than $2,976,396, plus New York statutory interest of 9% per year compounded.  *See* NY CPLR § 5004.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court enter judgment against Keurig and in favor of BanQu, and issue the following relief:

A.    Compensatory damages against Keurig in an amount to be determined at trial;

B.    Disgorgement of Keurig's ill-gotten gains;

C.    Prejudgment and post-judgment interest;

D.    Costs and attorneys' fees; and

E.    All such other and further relief as the Court may deem just, proper, and equitable.

Dated: July 2, 2024

Respectfully Submitted,

 /s/  Douglas S. Curran
Douglas S. Curran
Jonathan Kortmansky
**ANDERSON KILL P.C.**
1251 Avenue of the Americas
New York, NY 10020
Telephone: 212-278-1000
Facsimile: 212-278-1733
dcurran@andersonkill.com
jkortmansky@andersonkill.com

*Counsel for Plaintiff BanQu, Inc.*

## DEMAND FOR JURY TRIAL

BanQu hereby demands a jury trial of all claims and causes of action triable before a jury.


Dated: July 2, 2024                                    Respectfully Submitted,

                                                        /s/ Douglas S. Curran
                                                       Douglas S. Curran
                                                       Jonathan Kortmansky
                                                       **ANDERSON KILL P.C.**
                                                       1251 Avenue of the Americas
                                                       New York, NY 10020
                                                       Telephone: 212-278-1000
                                                       Facsimile: 212-278-1733
                                                       dcurran@andersonkill.com
                                                       jkortmansky@andersonkill.com

                                                       *Counsel for Plaintiff BanQu, Inc.*